The 4th District of Public Order of the State of Illinois does now convene, Governor Eugene G. Doherty presiding. Good afternoon, please be seated. We are calling case number 424-1115 In Right Marriage of Schonert. Would counsel for the Petitioner, Appellant, and Cross-Appellee please state your appearance. Attorney Linda Watson. And for the Respondent, Appellee, and Cross-Appellant. Attorney Tamara Meister. Alright, we'll proceed just as a reminder that there will be two five minute rebuttal periods, one for each party. May I make a point of inquiry before I begin, Your Honor? You may. With the five minute rebuttal, may I then also address the cross appeal on my initial 20 minutes? If it's in the proper sequence. So you are speaking right now as an appellant. Yes. So you would address that in your final five minutes? Yes. Thank you. That does not amplify. It records. So you need to keep your voice up. I will keep that in mind, Your Honor. I've never been accused of being soft spoken. Good afternoon, Your Honors. My name is Attorney Linda Watson and I represent the Appellant, Samantha Schonert. You may at times hear me referred to as Sam. This case involves an appeal brief of basically two issues. The first being maintenance and the second issue being the identity of a car. A 1969 Ford Mustang. The 1969 Ford Mustang was conceded to be Samantha's non-marital asset in the appellee's brief. Therefore, I do not plan on addressing it unless Your Honor has questions for it. Was it conceded sort of in a if this then that type of way? Meaning as long as my vehicle is non-marital, her vehicle is non-marital? I believe that is exactly the argument that the appellee tried to make, Your Honor. The problem with the argument is she's conceding that it's non-marital. Period. Both of the parties at the trial level conceded that it was Samantha's non-marital asset. That's denoted on his financial affidavit. It was denoted by counsel in her arguments and it was articulated again throughout her entire brief. The 1969 Mustang was clearly agreed to by all parties as being non-marital and there's a reason for that. The 1969 Mustang was brought into the marriage by Samantha and had been in her possession for decades prior to the marriage. It doesn't matter if it was decades or ten minutes. It was brought in, it started out as her non-marital property, but the same is true of the Blazer as to his property. Correct? Correct. There were two Blazers. The one we're talking about. Yes. Isn't that fun? We have two 1969 Ford Mustangs one marital, one non-marital. Two Blazers, one marital, one non-marital. You like what you like. That's right. But therein lies the problem, Your Honor. We can't treat them all as a unit and just treat them all as the same and walk on. We have to treat each individual piece of property separately and identically and do an analysis for each piece. And that's the problem with the Pele's argument. She wants to just treat them all as a bundle and walk on. And that's not how we treat property. We have to make a specific identity finding for each and every item. And I suspect the reason why she's conceding that the 1969 Mustang is non-marital because it's clearly non-marital. It was completely rehabilitated at the time she came into the marriage. Only minimal cosmetic renovations were done to the car. It was intact when she brought it. Her father, Mr. Wick, testified to all of the refurbishments that they had done as a family many, many years before the marriage. The only thing that Mr. Schotter did was as a surprise gift that was his testimony to Sam, he had updated some of the carpet and the vinyl rack top and some of the seating. This is all cosmetic. There was nothing about the 1969 Mustang that was substantive that would have increased its value to transmute it from non-marital property into marital property. And indeed Mr. Schotter brought no such evidence to the court. So it is absolutely logical that the appellee conceded that the 1969 Mustang was non-marital. Since I can't address the blazers just yet, I'll reserve the rest of the argument for later. The other part of the appeal brief, Your Honor, and in fact the bulk of the appeal, as far as volume, dealt with the issue of maintenance. Maintenance in this case, Your Honor, quite frankly was a conundrum when the ruling came out. As we all know under the IMDA, the court requires, the statute requires, under 5504B2 that when we have a maintenance award that's not in accordance with the guidelines, the trial court shall not may or should, shall, under 504B2 make specific findings of fact and articulate its reasoning. That, Your Honors, we don't have in this case. Let me ask this question, Counsel. Isn't there more to establishing a need for maintenance, if you will, than simply running a calculation? Thank you for that question, Your Honor. I think that the answer to that is yes. So then if I may, before you continue, just to help focus this, without referring to the financial affidavit, what other portions of Samantha's testimony then support the statutory maintenance factors? Thank you. And before I fully answer my question, I also want to note that the other factors indicate that a court doesn't have to find need in order to award maintenance. The court may take any factor and weigh it and determine a maintenance award. Particularly when we're looking at Factor 12, which is contribution to the marital estate. And I'll get more to that in a minute. But to answer Your Honor's question, Samantha testified that they had enjoyed, as a family, substantial income for the 25 years of their marriage. Indeed, when we look at their incomes, their combined income was approximately $400,000. Of the $400,000, Samantha's income, her base income, was a mere $88,000. It took all of the couple's income in order to facilitate their lifestyle. Samantha testified and Scott testified that Scott paid all of the bills for the marriage. He paid the home, he paid the mortgage, he paid the day-to-day living expenses for the home and the cars. Samantha testified she paid for the children's extracurricular activities and groceries. That was the testimony. Further, at the time that Samantha went to hearing, she testified that she was completely racking up credit cards in order to support the day-to-day needs of the two children for which she was the primary custodian. At the time that we went to hearing, the party's two children, the oldest, was in college. Samantha gave extensive testimony to almost $30,000 of credit card debt that she had gone into in order to solely support the needs of that college student. She talked about insurance, cell phones, cars, tires, and particularly... Did she file a petition for college expenses? She did. It's still pending. There's a petition for college expenses that was filed at the time or post-judgment? Yes. Both. Where in the record is the petition and was that rolled upon by the court? College expenses is still pending. We renewed our petition because opposing counsel had claimed in my request for a hearing on the college expenses that the parties had waived it because they had allocated a marital asset to cover some of the expenses for the college student. Out of an abundance of caution, I reviled the petition. The original request for support is in the petition for temporary relief where she requests support for the minor child and the older child who was in college. But there was an asset allocation, as I recall, to satisfy those expenses? There was an asset allocation to satisfy some of the expenses. It was never determined what it was for. The parties agreed in December of 2022 that a $50,000 asset was going to be set aside and given to Chloe, the oldest daughter, in order to assist with her college expenses. She's at a private school four-year institution. When you reserved the issues that were going to go to hearing, did you reserve college expenses? It was never rolled on, so yes. Did you specifically identify that in the record before the court? It's in the judgment, yes. I think there's a difference between it being pending and you reserving it. Yes, I believe that both are true in this particular case, but yes. But you went through a list with the judge as to what would be heard, the issue on the Mustang, other matters. Did you identify college expenses at that time verbally? The college expenses at the time was reserved in the judgment, and then we proceeded later on the college issue for the tuition. Thank you. Yes, ma'am. Samantha's testimony with regards to need, and to answer your Honor's question further, she articulated by the time they went to hearing, she was racking up credit card debt. At the time that she went to hearing, she had approximately $30,000 of credit card debt and could not satisfy that bill without liquidating assets. Further, her financial affidavit, which was uncontroverted at the time of trial testimony, articulated a deficit for her day-to-day living. Samantha's base salary approximated, after taxes, $5,700 a month net for her to live off of. The house, the home, the car, the gas, the electricity, and so on and so forth, basic needs for the children, approximated $4,500. She was living paycheck to paycheck with no contribution from Mr. Schauner. In fact, Sam didn't get contribution for child support until court ordered almost a year and a half after the filing of the petition of dissolution. She had to have a specific hearing in order to get child support for the remaining minor child. All the while, she was floating the children and the home. At the time of the ruling, the court merely articulated Factor 2. That was the reasoning and the specific finding that the court attempted to articulate in his ruling, which I assert to this court falls far short of the requirement of 504B2. When we look at the needs of the two parties, it's difficult to understand the court's reasoning. And because there is no reasoning by the trial court, we're left to speculate what factors, what findings he found in order to determine how he reached this ruling. The fact of the matter is, we just don't know. Because the court made no findings of fact, he made no reasoning in his ruling, he merely said Factor 2. We honestly don't know what in the record led to this reasoning. So we're left to speculate. At the end of the day, I think that the party's financial affidavits really outlay the disparity in the income and her need for the maintenance. When you look at her day-to-day operations of her running her household with her and her children, she's at a complete deficit. Whereas Mr. Schauner articulated in his financial affidavit, he enjoyed $3,700 a month for hobbies and entertainment. And even after that, he had more than $3,500 surplus every month. That is a huge discrepancy in the party's ability to meet their day-to-day needs. And that testimony, Your Honor, was uncontroverted by either party. That was the financial affidavits that they stood on when they went to hearing. Samantha also testified that she didn't have the ability to pay Mr. Schauner the $200,000 offset for the equalization of the Merrill Settlement Agreement. She had to borrow the money from her father because the taxes that would be incurred in the liquidity of her only remaining assets that she could liquefy was so cost-prohibitive she had to borrow the money from her father. And at the time of the testimony for the hearing, she testified she still owed that money and she was quite frankly not sure how she was going to pay it. The court's ruling is further confusing when we look at a case that he had just ruled on months prior to this one. The findings of that case is completely a 180 from the rulings of this case with almost the same facts. You know, it's problematic for us to review one case by reference to another because it requires us to know all about the other case, which of course we don't. I also have a question. Yes, sir. I'm not faulting your client, but it appears as if she chose to support the college-aged daughter. Of course. And did it generously. Yes. Okay. But that choice is part of what makes her living expenses greater than she's able to handle. And yet, in future those expenses may be reimbursed, so if she gets maintenance because of the choice she made, is it a form of double-dipping then to get reimbursed for those college expenses? I'm glad you asked me that, Your Honor. I am too. I am reminded of, in regarding the marriage of Dunstath, where the court articulated that a spouse is entitled to maintain a reasonable approximation of the standard of living established during the marriage. Further, in regarding the marriage of Shinn, a spouse is not required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet the needs and that of his former spouse. In this case, the parties had already set a precedent of supporting their children as they went off to college. The parties had already established a precedent of paying for their children's car and their gas and their health insurance. My client merely sought to maintain the standard of living that the family had enjoyed prior to the filing of the petition for dissolution. The only person who actually got to enjoy an increased standard of living, who didn't have to decrease their standard of living, was Mr. Schoenert. So if we look at the timeline, Mr. Schoenert was happily, or he was engaged in providing for the college expenses of the older daughter. I believe Ms. Schoenert's testimony at the time of the trial was that they had agreed that they would support her for her four-year degree, that she would do all she can in her grades to get the grants and the scholarships and so on and so forth. They would support her in the car, the gas, some of the extracurricular traveling and so on and so forth, and they would contribute to the overall tuition. I don't believe anybody testified, Mr. Schoenert or Sam, with regards to what that agreement was, because I don't think the family knew. But at the time of the dissolution, there definitely was a precedent and understanding that they were going to support the children in their college endeavors. But the only one that was doing that at the time of the dissolution was Sam. Moreover, when we look at Mr. Schoenert's financial affidavit, it's confusing, because he said, according to his financial affidavit, he articulated that he was spending $2,000 a month to support Chloe. But then his testimony on the stand, he admitted that he had actually never sent her $2,000 and had never supported her for $2,000 a month, ever, by the time we got to hearing. He also articulated in his own financial affidavit that he had $3,700 a month that he spent on himself for entertainment and hobbies and still had an overage every month of almost $3,700. So, as far as need, there's a clear need on one side of the aisle and a clear increase in lifestyle on the other. The maintenance award in this case is not just confusing, it's arbitrary. It is arbitrary. Further, I would like to point out that need is only one of the 14 factors. There are numerous other factors here wherein a court should have awarded maintenance in this particular case. Aside from the incomes, of which you are probably well aware of, Sam with her SIP bonus, they work for the same company, Caterpillar. Sam with her base income was at approximately $130,000 a year in 2023. Mr. Scharnert's base income was $182,000. Even though Sam started at Caterpillar before Mr. Scharnert and actually pulled him into CAT and assisted him in that process so he could join the company, by the time they went to dissolution hearing, Mr. Scharnert's total package with CAT, including his SIP, allowed him to have a yearly salary in 2023 of $271,154.06. Sam, on the other hand, who had actually been at the company longer, was $161,681.74. So, she made less than half, 37% of the total marital pie. That is because she contributed to the rearing of their children and dedicated to Hearth and Home. That brings me back to Factor 12. The court did not base everything on need, although I do argue there is extreme need here, but even if the court found that there wasn't a need, Factor 12 is equitable here. My client took a backseat to her career at the same company, didn't rise the ladders, didn't rise her income. He did. She tended to Hearth and Home so his career could rise. So, by the time we got to the petition of dissolution, he's making just shy of $300,000 and she's making a little over $150,000. Where in the record specifically does she have testimony that she focused on domestic duties such that she was forgoing opportunities for employment? Based upon memory, page 224. I'll also note briefly in the 30 seconds I have left that the parties had an agreement at the time of the initial agreement to have an equal allocation of the marital estate. It was supposed to be equitable, but at the end of the day, what we ended up with was a dis-equitable allocation. Mr. Shonner's income, able to enjoy solely on his own, with his living expenses far subservient to his month-to-month income. With Sam having to seek legal pressure in order to obtain monies for college and child  Thank you. Any other questions? I asked the clerk to approach for me. All right. All right. Councilman Maycroft. Good afternoon. May it please the court. I'm Tamara Meister, attorney for appellee, cross-appellant Scott Shonner. The trial court properly denied Samantha's maintenance claim. The court, in weighing all of the factors defined in 504A of the IMDMA, correctly found that maintenance was not appropriate and that as such, Samantha was not entitled to maintenance. Maintenance is not an absolute right of every party in a marriage and it should be mainly reserved for circumstances of necessity. The party seeking maintenance bears the burden of proving their maintenance claim at the trial court level. And at trial, Samantha did not present evidence to support her request for maintenance. At trial and on appeal, she's focused solely on two factors, income and the alleged needs of the parties. Samantha did not present any evidence regarding factors 3, 4, 5, 6, 6.1 or 12 of the underlying factors of the IMDMA. She's arguing that maintenance is necessary for her to meet her basic expenses and support the standard of living that she enjoyed during the marriage. And in reaching that conclusion, she focuses solely on her financial affidavit. The problem with Samantha relying on her financial affidavit is that the court, in denying maintenance originally in its December order, specifically stated as follows. Under the factors listed in 504A, maintenance is not appropriate in this case. In this regard, the court specifically notes the inaccurate financial affidavit filed by petitioner as it relates to retirement accounts. I had a question about that. Yes, Your Honor. The retirement account she said was worth a million. Yes. And later determined it was worth $54,000 more than that. $136,000 more than that. $136,000? Yes, Your Honor. Yes. Samantha testified on her financial affidavit. She listed $1 million even on her financial affidavit. As of the date that she signed the financial affidavit, we submitted a statement that was used as an exhibit 8 days past the signing and it was $1,136,000 and some change. The statement was a one-month statement and it had about $17,000 of gains and losses. And so in her replies and in the trial court level, Samantha argued, well, this was a rounding error and this was simply an oversight. I could potentially see how $17,000 being the gains and losses within that one-month period may be a rounding error, but $136,000 is far from a rounding error, Your Honor. And I think that the trial court really grasped onto that and found it to be an issue. In addition, the trial court, in denying Samantha's motion to reconsider, specifically stated, maintenance is denied based on 750 ILCS 550482, 7, 10, and most importantly 14, i.e., misrepresentation of retirement accounts by petitioner. The trial court is the one most uniquely situated to weigh the credibility of witnesses. And this was certainly an issue that the trial court grasped onto. For him to make a specific factual finding about the inaccuracies in an underlying financial affidavit that is supposed to be the sworn testimony of the parties is a big issue. And I think it's a signal that the trial court had some big issues with credibility on Samantha's part. Does the fact that it's such an obvious round number, I don't think anybody probably thought that was the exact number of accounts. Doesn't that sort of telegraph that it's an approximation? I think it could be a telegraph that it's an approximation, sure. And that is what arguably brought some attention to that issue. But the underlying problem is that our Supreme Court rules and our local court rules require parties to sign that financial affidavit. On page note of the financial affidavit, it states if you intentionally or recklessly enter inaccurate or misleading information on this form, you may face significant penalties and sanctions, including costs and attorney fees. And so it's not just an intentional error that requires parties and attorneys to properly fill out financial affidavits. It accounts for reckless errors, Your Honor. Don't we also look at the likelihood or lack thereof that the other party was misled? In other words, was the other party really counting on it being exactly one million or did they recognize that's an approximation and that they needed to ensure the action? And the numbers are going to go down. Sure. And the numbers certainly do fluctuate with the market. Our retirement accounts fluctuate every day. I think that it could put the party on notice, but I think what's important too is that this is the quick measurement or main piece of information that the court has available to it. It is what the courts and attorneys pull up as what are the income, what are the expenses, where are the retirement accounts. Therefore, there's even more importance in truthfulness, credibility, and those numbers and figures being accurate. In addition, the retirement accounts, the retirement income, and the distribution of the marital estate is one of the specific factors that a court has to take into consideration in determining if maintenance is appropriate or not. This may be passe or not used anymore, but financial advisors often talk about you should only take 4 or 5 percent of your retirement monthly in order to make sure that your retirement lasts until you last. Sure. So how much difference would her monthly retirement be if she was off by $100,000? I'm not sure, Your Honor, and I don't know. There was never any discussion of that at the trial court level. That would be of interest though, wouldn't it? It would be of interest, but I think that the whole notion that the trial court really grasped onto here was that there was a credibility issue in the financial affidavit. In addition to this $136,000 differential in the 401K, she omitted two IRA accounts that totaled just over $100,000 from her first filed financial affidavit to the second. When questioned, she testified that those were both still in existence, and she didn't know why they were left off of her financial affidavit. So in total, there was about $240,000 left off of her statement. We're talking about retirement funds and then maintenance, right? Sure. Retirement funds were divided equally? They were. So either they were $1 or $1,000,000? Sure. Same thing? Sure. And again, I think it just goes back to the trial court specifically noted factor 14, which is any other factor that the court can take into consideration in awarding a maintenance amount. And it specifically indicated that the inaccuracies on the financial affidavit were a specific factor that the court was taking into consideration. But how would they affect...what was incredible as a result of that? Well, I believe that it was just in support of the court's proper denial of maintenance. I believe that the court was able to put a certain amount of weight on that factor and on the credibility of the witnesses such that it is in support of the trial court's decision. What fact was in dispute that might help the trial court resolve it against the party that understated her retirement account? I'm sorry, can you repeat the question again? What fact was in dispute, meaning a matter on which credibility might be relevant, that this would help the judge resolve? Well, I think... In other words, what's the judge going to say? Well, I'm not sure I trust her on X now because she understated her retirement fund. Arguably, all of the factors. And I think that it's particularly relevant in this case because there was a lack of other evidence introduced at the trial court level. There was a sole reliance on the financial affidavit. Right, but I mean it could have been one of the other consequences. It could have been a sanction, it could have been an attorney fee award, but instead an understatement of the retirement account, which ultimately doesn't matter because they were all split evenly, is taking away her maintenance. I do think that it's relevant even if they are split all equally. Because in addition to the fact that they were all split evenly, there was an equalization payment owed from Samantha to Scott. So the equalization payment of $200,000 was owed from Samantha to Scott in order to achieve the 50-50 distribution of the assets and the debts. And Samantha testified at trial that her dad paid that equalization payment. An argument we heard that... How does this bear on the maintenance decision? I think that it bears on the maintenance decision because it's one of the factors. The allocation of the marital assets and the marital debts is one of the factors that the court has to consideration in determining whether or not maintenance is appropriate. And so Samantha, in not paying that $200,000 equalization payment, is now in a greater position by $200,000 such that she's received a greater portion of the marital estate. She did not testify, Samantha did not testify at trial that she owed her dad that money or that it was cost prohibitive for her to pay that directly. There is no testimony regarding that issue. Whereas your point would be there could have been testimony that she was required to pay it back. Absolutely. And so without that evidence there's a presumption of a gift. Her father did not testify, a contract was not introduced that evidence for a repayment, no statements were introduced wherein she was proving that she was paying her father back. She owns the home outright, an almost $700,000 roughly, there was an argument against the valuation of the home, between $650,000 and $750,000 marital home. She owns outright with no mortgage. There was no HELOC. She didn't liquidate any of her retirement accounts. Can you remind me of, the payment would have been after the trial court's decision, right? No. She paid the $200,000 prior to the final trial, well before. Rather, her father paid the $200,000. When did the judge decide that that was the opposite? I'm sorry? I don't know how you pay it before the judge decides it, so when did the judge decide that? Sure, the parties put an agreement on the record wherein they reserved certain issues. College expenses was not one of those issues specifically reserved in response to one of your previous questions, Your Honor. But the equalization payment was agreed to be paid within a certain period of time of that December, I think it was December 2022. And it was paid by her father. So by the time we got to trial a year and a half later, that money had been spent out. Well, this is not a determinative factor. I'd like to ask, is it accurate that his salary is approximately double hers? No, Your Honor. Thank you for asking. So both of these parties are employed full-time at Caterpillar and have worked at Caterpillar their entire careers. In 2023, Scott's base salary was about $182,000. Samantha's base salary was about $130,000. So if you run the calculation for maintenance, let's assume that the court is going to find maintenance to be appropriate, which it did not, but let's assume so. Samantha caps out of maintenance by $40,000 per year, just using their base salaries. However, Caterpillar employees have the opportunity to earn a bonus every year. It's called a STIP payment. And Scott's STIP is higher than Samantha's STIP because he's higher up at Caterpillar. There are also a number of other factors that go into how much STIP an employee receives at Caterpillar, including what the business is doing overall, what their specific business unit is doing, and then the individual's performance. But income tax is paid on that. Oh, yes, Your Honor. So the STIP is part of the income. It is, yes. What was the STIP, the most recent STIP at the time of trial? The most recent STIP at the time of trial, Scott's was $88,000 and some change, and Samantha's was $31,000 and some change. STIP does not happen every year. For example, in 2021, there was no STIP. There was no bonus. So certainly when you look at income from all sources, which is what the maintenance statute tells us to do, Scott earns more on a yearly basis if his STIP is more than Samantha's. I think that in some of my exhibits in calculating maintenance if the court found maintenance to be appropriate, I took a three-year average of STIP for both parties because those numbers do fluctuate. And maintenance, if you took a three-year average, if I'm remembering correctly, would have been only a couple hundred dollars a month if the court found that maintenance was appropriate and necessary, which it did not. And we believe that that was an appropriate ruling. Thank you. Circling back just for a moment to some of the retirement accounts, if you will, I just want to confirm that I know there were a variety of reports that were submitted and calculations made, but there was no expert testimony admitted at trial, correct? Are you asking regarding the pensions, Your Honor? Yes. Yes. I can talk about the pensions. So the court did, they did a order that the marital portions of both of the pensions would be equally divided. So they did not apply an immediate offset approach. The trial court, we had a number of pre-trials. One of the pre-trials specifically requested that the parties obtain experts to do an actuarial evaluation. Were they admitted at trial? It was admitted at trial, post-trial, by agreement of the parties and per court order. The experts did not testify. But the reports from both, that is in the record C-367, the parties shall exchange and file with the court all demonstrative stipulated exhibits. The parties shall prepare retirement valuations, packages prepared by their respective experts, exchange the same and file. And the parties do stipulate to the same. So yes, both of the parties' expert valuation packages were part of the record as exhibits and stipulated to. And I know you mentioned that Scott claims that this would be a good case or a good candidate, if you will, for offset. Yes. Because we know the value. We do. But it seems a bit of a contradiction because then one of the reasons that you base the argument that it shouldn't have been split is that if one of them retires earlier or later, that dramatically changes the value, which puts us in the case of we don't really know the value then. Sure. So it seems a bit of a contradiction to me. So could you address that? Yes, I can. So an immediate offset approach is appropriate when there's adequate actuarial evidence to ascertain the present value of a pension. And the employee spouse is close to retirement and there's sufficient marital property to allow for an offset. All of those things are present. Because they are both fully vested in their pension and they are not allowed to contribute into that pension anymore and Caterpillar has stopped contributing into those pension plans, we know the current value of the pension at the time of trial. And that's what the court is going to take into consideration if there is an immediate offset approach. What is the current value of these future benefits at the time of trial? So both of the experts used the same quotes by Caterpillar that were entered into evidence at the trial court level. They both assumed the same age of retirement, same date of marriage, the current age, date of birth. There was a bit of a fluctuation as far as the life expectancies of both of the parties, but only within a matter of months for both parties. And they used slightly different interest rates. But at the end of the day, when you compare it, Scott's expert indicated that he would owe Samantha $93,500 if a present value, if an immediate offset approach, whereas Samantha's was $100,000. And so we're talking about a $7,000... What was the court's decision though that it made on these accounts? Arbitrary, unreasonable, or inequitable? I believe that it's unreasonable and inequitable when you take into consideration the volatility of the litigation between these two parties. And we had hearing after hearing. The record would reflect that the court held an auction regarding light bulbs. And when you get to that level of volatility, one of the purposes of the IMDMA is to end entanglements between parties. And awarding each party each of their own pensions at the time of divorce would certainly end entanglements between these two parties. Especially when you take into consideration the fact that a retirement age will affect what the other party is going to receive. And certain survivor benefit elections will affect what the other party could potentially receive. And that's just the way that the plan specification is built. An alternate payee is able to commence their benefits at any time that they would want pursuant to plan specifications. However, when the participant elects to commence their benefits, that alternate payee's choice ceases. And the alternate payee must commence their benefit at the time that the participant does. So for example, if Scott decided to retire early at 55 instead of 60, that monthly benefit will shrink and Samantha's portion will then shrink. Likewise, if Samantha decided to retire early, her monthly benefit will shrink and therefore Scott's portion of the monthly benefit would also shrink. So it's unreasonable to ask these parties when everything has been equally divided 50-50 and they have, for planning purposes, the ability to manage their estates and retire when they would like to, to not give them that opportunity to still achieve a 50-50 distribution of the marital estate but to give them that sense of freedom that they are not further entangled in one another's lives. I'd like to discuss the cars very briefly with my two minutes. I have a quick question on that car then. I just want to confirm wasn't Scott's testimony that he worked on the Mustang as a surprise gift, as was indicated for her birthday while she was in France? Yes, he did. He did work on the Mustang. He testified as a gift. And with regard to the laser of the Bronco, if you will, wasn't that within the trial court's province, if you will, to evaluate Samantha's testimony and decide, couldn't they have reasonably found that they found her credible in that area, that everything was altered, repaired, or replaced except for the key? I don't think so, Your Honor, because when you're talking about transmutation, per the Illinois Supreme Court in Olson, every act of commingling or every use of marital funds for the purposes of non-marital property does not automatically work a transmutation. The language is that the making of or paying for repairs and maintenance that do not materially add to its value and or do not reduce any indebtedness on that item do not raise a presumption of transmutation. So materially added to its value. There was no evidence introduced at trial on how any of the work that Scott performed or the tires that he put on the car, on the blazer, or an alleged engine that went into the blazer, how that materially added to its value because there is no appraisal on that blazer or on the 1969 Mustang that showed us or told the court this was the value of that vehicle coming into the marriage. We just don't know that. And so we don't know how any of these funds or work materially added to that value. Therefore, you can't prove transmutation. It was Scott's position coming into the case that his 1970 blazer that was titled solely in his name, never had Samantha's name on it, had no indebtedness coming into the marriage, was his non-marital property. Likewise, the 1969 Mustang that was always titled in Samantha's name that she came into the marriage with was her non-marital asset. And it was stated over and over that all of these vehicles need to be treated the same. Thank you so much. Thank you. Counsel? Before you get started, the time that we've allocated here is pursuant to local rule. I will say that I would not feel rushed at the end if you've got a few more comments. Thank you, Your Honor. One point of clarification in answer to Your Honor Leonard's question. In the record, page 361, Ms. Meister accurately articulates that we were instructed to file demonstratives with the court with regards to the retirement accounts. By the time we got to the trial, we found that Mr. Schonert's demonstrative articulated that the evaluator had made evaluations and assumptions based upon discussions with attorney. At the time of trial, I objected to the evaluations then going before the court. That's in the record page 361. That report, that retirement was never omitted before the court. We had a stipulation. I withdrew it by the time we came to court. Moreover, I would note for the court that Ms. Schonert's entire brief goes into extreme detail how volatile these pensions are, particularly at the time that we're in hearing. In 2023, the pension investments is all over the place. They were up, down, and sideways with regards to the investments, and that was part of the problem. The volatility of the pensions with regards, in addition to the narrative factors that really affected the overall ability to evaluate the pensions, really made them impossible to value. That's articulated in Mr. Schonert's own brief. According to the case law, a flat offset approach to retirement is not favored unless the trial court has substantial actuary evidence. The trial court had none. I don't know how the court could have done anything other than order a quadra or a quildro. That also goes into your honor, the very issue on the maintenance. Because on the maintenance case, what happened is, I think, the trial court grabbed onto this argument, this red herring proffered by Mr. Schonert, that oh, she's hiding retirement assets. Your honors, there's no way to hide retirement assets in this case. They were all equally divided. And they had already been equally divided. They were clearly denoted in our 2022 financial affidavit. They had agreed to the equalization and the allocation of them in the December of 2022. It's clear, at least to me, that the party is trying to show the court what issues were at play, and she's trying to get those issues before the court. And anybody that writes six figures after the word one, I mean, clearly we're talking about an asset that fluctuates. And we're most definitely talking about a 401 that was doing massive fluctuation at the time that we went to trial. Going by memory, I believe Samantha also testified when she talked about why she did it that way, because she rounded. She said at one point she had looked and it was under a million, at another point she looked and it was over, so she wrote a million because that was her best guess for what it would be at any given time. That's reasonable. Moreover, your honor, it's a total red herring. She has one half of the retirement assets, he has one half of the retirement assets. That does not affect the maintenance calculations. They each got half. If the court is going to talk about credibility, then he really needs to talk about how Mr. Schoenert said that he was spending $2,000 a month to support his college child, put that on his financial affidavit, signed off it at a maintenance hearing, and then testified that he'd never done it. Never paid it. The Mustangs, I think your honors have got a good beat on that. There were two people that testified that those blazers were broken down to everything but the key. Sam and her father, Mr. Wick, who was an engineer at CAT, and he had actually helped with all of the breakdowns and the rehabilitations of all of the cars. There was ample evidence. In addition, Sam at the time of trial went through numerous pages of the shop that they have at their home, and all of the cars in various stages of pieces, and not a piece of that shop wasn't littered with car parts everywhere. She testified to it, Tom testified to it, to stand in front of the court and say there was no evidence is disingenuous. Well, I have a question about that, though. How do you assess the value of what would be viewed as a, not an antique, but a desirable vehicle? Well, yes, it has to have an engine in it. Yes. But you've got to know how much that stuff costs. I think the point of the testimony you're offering... It may be worth $5,000, it may be worth $40,000, depending upon the market for these kinds of vehicles, if you would choose to sell it. How does a trial judge figure that out? There were appraisals of those Blazers. There were. And they were all by the same person. He did the appraisals of the Mustangs, he did appraisals of the Blazers. It was the same. But not before and after. It was after the work, so we don't know what was added by the meritable contribution. You're exactly right. I think, though, when the trial court looked at the testimony from Sam and Mr. Wick and saw that everything had been taken down off this car, not a thing had not been deconstructed and reconstructed, the court found that there was no way not to find that it hadn't been transmuted. And that was the point, that everything in that car had been refurbished and redone, except for the key. Thank you. All right. Counsel. Thank you. I just wanted to point out that the stipulation for the expert reports on the retirement accounts, that stipulation in writing C-367, was done at the close of trial, at the same time that we were preparing our closing arguments. And so both counsel and both parties referenced those stipulated exhibits in their closing arguments and that stipulation was made at the close of trial. That trial date or that order date is November 28, 2023, at the close of trial, not prior to trial, or during trial, after trial. So there was the objection to foundation during trial. There was. And that was sustained. It was. But then later, that order is the stipulation with regards to the specific admission? Yes, Your Honor. Yes. And this court order then supersedes the objections that were made during trial. And they were referenced by both counsel in their closing arguments and asked the court to take them into consideration. I think that as to the vehicles, the 1969 Mustang and the 1970 Blazer need to be treated the same. They're either both non-marital or they're both marital. And our position at trial and still is that they are both non-marital. Because without an appraisal at the time of the marriage, or coming into the marriage, there is no evidence to ascertain how much material value was added during the marriage. There's no receipts or proof of how much these expenses cost. In addition to that, case law and statute indicates that any improvements made or interest that increases on a non-marital asset continues to be non-marital in designation throughout the duration of the marriage. And again, mere maintenance of a vehicle, an engine, tires, etc., does not then transmute that non-marital asset into marital property. That's an interesting point, but what's testified to is far more than maintenance. You're not just maintaining a vehicle if you put a new engine in it. Well, it depends, I guess. If the engine is not working anymore, in order for the vehicle to run you have to put a new engine into it, much like on a house. If you have a non-marital property and it needs a new roof, that's maintenance, but it's necessary. And we don't know how much a new roof or a new furnace or a new engine or new tires materially adds to the value of something without knowing what the value of that asset was at its premarital designation coming into the marriage. Isn't it also possible, though, that the court could have decided at this point there were so many replacements and repairs that it had lost its identity as the initial item? It could have, and the court did not specifically indicate why it designated the vehicles to be both marital. It certainly could have found that it did lose its identity. However, the 1970 Blazer is still a 1970 Blazer. The title is the same. It still is in Scott's name only. The 1969 Mustang is still a 1969 Mustang. It's still titled as such. It's still only in Samantha's name. And so I don't know that it actually lost its identity. A lot of these transmutation commingling cases has to do with transfer of funds from a bank account or an investment account one to the other, such that there's detailed tracing involved and a loss of identity if marital funds and non-marital funds are going into the same account. It's a little bit more tricky when you're talking about a piece of actual property. But I would argue that, no, it did not lose its identity. There are two issues that I'll try to discuss very briefly that we mentioned in our cross-appeal. The trial court's original order denying retroactive child support was proper, whereas the court's ruling on the motion to reconsider was an error. Samantha argued in her motion to reconsider that retroactivity pursuant to statute, retroactive child support specifically, is mandatory. However, that is not how the statute reads. Retroactivity is not mandatory. Rather, in remarriage of Rogliano indicates that it's well settled in Illinois, that retroactivity is ordered at the discretion of the court. Retroactive allowance in a dissolution proceeding is within the discretionary power of the trial court if such an allowance is deemed fit, reasonable, and just. And Samantha did not prove her motion to reconsider as to why the court failed to apply the proper law in its original deniance of retroactive child support. Counsel, even if we assume that Samantha's motion to reconsider did not state a meritorious basis, wasn't it within the authority of the trial court, though, to order, if it's been drawn to their attention, that TS is not getting support once Scott moved out, wouldn't the court be within its authority to order support? Yes, Your Honor. The court would certainly be within its authority to order retroactive support, but if it did, it would need to order statutory child support. The court did not apply the proper calculation from the time period of March 2023 to August 2023. The parties at that time were close to a 50-50 parenting time schedule, such that the actual child support calculation should have been $568 a month for that period of time, but the court ordered $935 a month, which was the effective child support obligation effective in August, and the parties reached an agreement on that figure. So if this court affirms the partial ruling on the motion to reconsider allowing retroactive support for that period of time, I think it should be adjusted to the proper statutory calculation of $568 per month. Thank you. Alright, thank you. We will stand in recess, issue a disposition of new court.